J-S57022-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| QUINTON R. CORPREW, | |
| Appellant | No. 1861 WDA 2015 |

Appeal from the Judgment of Sentence November 8, 2011
In the Court of Common Pleas of Cambria County
Criminal Division at No(s): CP-11-CR-0000675-2011

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN and STRASSBURGER,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED OCTOBER 6, 2016**

Appellant, Quinton R. Corprew, appeals *nunc pro tunc* from the judgment of sentence entered following his convictions of one count each of aggravated assault-serious bodily injury; aggravated assault-bodily injury with a deadly weapon; simple assault; and recklessly endangering another person ("REAP").  The crimes stemmed from an altercation Appellant had with his girlfriend's former paramour.  We affirm.

The trial court summarized the underlying facts of this case as follows:

**FACTUAL SUMMARY**[2]

> [2] The factual summary is distilled from the testimony presented at the September 7-8, 2011, jury trial without citation to specific portions of the record.

_____

[*]  Retired Senior Judge assigned to the Superior Court.

Dana Jo Snyder (Snyder) testified that on March 12, 2011, she was involved in a relationship with [Appellant] and they were at her residence when they were joined by the victim McGinnis. Snyder testified that she had an on and off relationship with McGinnis for approximately twelve years and that he was the father of one of her two children. Snyder testified that McGinnis did not want their relationship to end and was seeking to reconcile with her and was upset she was seeing other men. She explained that she allowed McGinnis into the residence to avoid problems and to try and convince him that their relationship was over.

Snyder acknowledged that when sober McGinnis was fine but that he could become violent when he drank, had broken David Herring's (Herring) leg during a fight, and had been violent towards her. She explained that while McGinnis could be violent he was not the type to attack anyone but that someone had to attack him first and that she warned various people, including [Appellant], that they didn't want to fight McGinnis because he would hurt them. Snyder acknowledged that she had told [Appellant] of the prior incidents of violence by McGinnis, including the breaking of Herring's leg.

Relative to the events of March 12-13, Snyder testified that after McGinnis arrived at her home, she, McGinnis and [Appellant] smoke[d] a marijuana cigar, a blunt, and that [Appellant] and possibly McGinnis had a few drinks. Eventually they went to the nearby Sue Bee's Bar because she wanted McGinnis out of the house. While at Sue Bee's[,] Snyder testified that she observed McGinnis and [Appellant] playing pool and that two or three times she went over to them because it appeared they were arguing and she wanted to prevent any trouble. Each time she went over the argument stopped and everything seemed okay.

Snyder explained that at some point she went out a side door with a few people intending to go home and was followed out by McGinnis and then [Appellant]. She accompanied her cousin back into the bar leaving McGinnis, [Appellant], and Herring outside. A minute or two after reentering the bar she testified that McGinnis opened the door and told them to call 911 [because] he had been stabbed. She testified that she saw

- 2 -

McGinnis'[s]shirt covered in blood and that there was a puddle of blood on the ground.

McGinnis testified that he and Snyder had been involved in a long-term relationship and that he had hopes of reconciling with her. McGinnis acknowledged that he could become violent when drunk, that he had broken Herring's leg during an altercation some years before but insisted that he would never attack someone first but would respond to violence against himself. On March 12 he went to her residence under the belief that they had plans to go out together and was surprised that [Appellant] was there. While at Snyder's home he, Snyder and [Appellant] had smoked a blunt and shortly thereafter went to Sue Bee's. While at Sue Bee's he and [Appellant] had a few drinks and played a few games of pool. During these games McGinnis expressed that he did not approve of [Appellant's] relationship with Snyder and that he intended to try and reconcile with her. McGinnis thought things were generally okay between him and [Appellant] but admitted to having a verbal exchange or two with him. McGinnis denied having threatened [Appellant] with a pool cue and denied having any weapons that evening.

McGinnis testified that he followed Snyder outside and that [Appellant] followed him. Once outside he and [Appellant] again exchanged words over the nature of Snyder and [Appellant's] relationship and the fact that McGinnis did not want [Appellant] spending the night at Snyder's. At some point Snyder and the others reentered the bar leaving McGinnis, [Appellant], and Herring outside. McGinnis testified that at some point during the argument it became clear he and [Appellant] were going to fight and that [Appellant] began walking around the corner of the building. McGinnis testified that he removed his jacket, threw it at Herring, and started to follow [Appellant]. McGinnis testified that while walking [Appellant] pulled a knife, turned around and stabbed him seven times. McGinnis testified that he tried to back away when [Appellant] was stabbing him and denied lunging at [Appellant] immediately prior to the stabbing.

Herring testified that he was in the bar on March 12, that he knew both McGinnis and [Appellant], and that McGinnis had once broken his leg during a fight. He testified that he saw McGinnis holding a pool cue when he was arguing with [Appellant] inside the bar. He explained that he followed

- 3 -

McGinnis and [Appellant] outside because he thought there might be trouble and he wanted to stop it before anyone got seriously injured. He testified that McGinnis and [Appellant] argued briefly, that McGinnis handed him his jacket and phone, that he saw [Appellant] walking away from McGinnis, saw McGinnis rush or walk quickly towards [Appellant] apparently intending to grab or wrestle him, saw McGinnis fall and at that point saw a knife in [Appellant's] hand. Herring testified that everything happened very quickly but that he saw [Appellant] stab McGinnis although he did not see the knife until McGinnis was starting to fall to the ground. Herring testified that after the stabbing [Appellant] immediately fled the scene.

[Appellant] testified that he had been at Snyder's residence on the evening of March 12 when McGinnis arrived. [Appellant] testified that Snyder had told him that McGinnis could become violent when he drank and that on one occasion McGinnis had struck her. [Appellant] testified that Snyder's mother had also told him that McGinnis can become violent when he drank and that he had once assaulted Snyder. He went on to say that he knew McGinnis had broken Herring's leg in [a] fight and that he had a knife with him that evening that he had taken from his nephew a few weeks prior. [Appellant] described the knife as a lock-blade knife whose blade would lock into place once unfolded requiring a button to be pressed in order to close the blade. [Appellant] acknowledged that as a convicted felon it was a violation of his parole to carry the knife.

[Appellant] testified that while they waited for Snyder to get ready he and McGinnis had a few drinks and then the three of them smoked a blunt before leaving for Sue Bee's. While at Sue Bee's [Appellant] testified that he and McGinnis each had a few drinks and played a few games of pool. [Appellant] testified that during these games McGinnis would become upset about [Appellant's] relationship with Snyder and told him that he should not spend the night with her. During one such exchange [Appellant] testified that McGinnis brandished the fat end of a pool cue at him and told him how easy it would be to split his head with it. He testified that after this incident he and McGinnis continued to play pool and drink together.

[Appellant] testified that at some point he noticed that Snyder had left the bar and saw McGinnis going outside as well so he decided to go out and make sure things were okay.

[Appellant] testified that when everyone else went back inside, he, McGinnis, and Herring remained outside. [Appellant] testified that everything happened very fast when McGinnis took his jacket off, threw it at Herring, and rushed at him grabbing him in a bear hug. [Appellant] testified that he was facing McGinnis at this time and had no opportunity to run. He testified that when McGinnis grabbed him and started to bear hug him that he pulled the knife out of his right front pocket and started stabbing McGinnis until he felt McGinnis'[s] hold loosen at which point he stopped stabbing. [Appellant] testified that he thought the first stab wounds were to McGinnis'[s] armpit and chest while McGinnis was pulling him into a bear hug and the ones to the back occurred while McGinnis was squeezing him.

Matthew MacGregor (MacGregor) testified that he is employed by the Conemaugh Health System and the Seventh Ward Ambulance service as an emergency medical technician (EMT) and that he was the first medical responder to the scene. MacGregor testified that his initial assessment of McGinnis was that he was in critical condition and that he immediately notified the Conemaugh Hospital ER that a critical trauma patient was inbound. MacGregor testified that the EMTs decided to try and control the bleeding and forego other treatment due to the close proximity to the ER and allow the trauma team to address McGinnis'[s] injuries. MacGregor testified that McGinnis was suffering from stab wounds to the left and right flank area on his back, near the left armpit, left side of his chest, and a large, deep wound to the left upper arm. MacGregor indicated that initial breath sounds indicated a slight decrease in the left lung.

Stephen Lee Miller, M.D. (Miller) testified that he is a trauma surgeon with Conemaugh Hospital and was part of the team that treated McGinnis. Miller testified that McGinnis had two stab wounds on the right back, one to the left chest, one to the posterior shoulder, one to the anterior right shoulder, a large laceration over the left pleural area, and a laceration to the left bicep muscle. In addition he had internal injuries including rib and scapular fractures that could only have been caused by significant force equivalent to baseball bat like force. Finally, Miller testified that McGinnis had a laceration to his left lung that resulted in a collapsed lung. Miller explained that the collapsed lung was a life-threatening injury and that such an injury can be lethal within a few minutes without immediate treatment. Miller testified that on the whole it required a significant amount of

> force to inflict these injuries and they were life threatening in nature.

Trial Court Opinion, 1/5/16, at 3-7.

On September 8, 2011, a jury convicted Appellant of the crimes stated above. On November 8, 2011, the trial court sentenced Appellant to serve an aggregate term of incarceration of ten to twenty years and also ordered Appellant to pay the costs of prosecution and restitution. Appellant filed a timely appeal, and this Court, finding all issues to be waived, affirmed the judgment of sentence on December 28, 2012. *Commonwealth v. Corprew*, 64 A.3d 37, 1907 WDA 2011 (Pa. Super. 2012) (unpublished memorandum). Appellant then filed a petition for allowance of appeal, which our Supreme Court denied on October 9, 2013. *Commonwealth v. Corprew*, 77 A.3d 635 (Pa. 2013).

On June 25, 2014, Appellant filed a *pro se* PCRA petition, and the PCRA court appointed counsel, who then filed an amended PCRA petition. The PCRA court held a hearing on September 4, 2014, and denied PCRA relief on November 24, 2014. On appeal, this Court vacated the PCRA court's order and remanded for the reinstatement of Appellant's direct appeal rights on August 19, 2015. *Commonwealth v. Corprew*, 131 A.3d 97, 2032 WDA 2014 (Pa. Super. 2015) (unpublished memorandum). Upon remand, the PCRA court entered an order on October 26, 2015, reinstating Appellant's direct appeal rights and noting that Appellant had thirty days in which to perfect his appeal. On November 18, 2015, Appellant filed the

instant direct appeal, *nunc pro tunc*. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents the following issue for our review:

1. The evidence presented at trial by the Commonwealth was insufficient to sustain a conviction for Aggravated Assault-Causes Serious Bodily Injury; Aggravated Assault—Causes Bodily Injury with a Deadly Weapon; Simple Assault, and Recklessly Endangering Another Person against the Appellant, especially in light of the defense of self[-]defense which was raised on behalf of the Appellant at trial.

Appellant's Brief at 2.

Appellant argues that due to his claim of self-defense, he should have been acquitted of all charges brought against him. Appellant's Brief at 10-36. Appellant asserts that the Commonwealth failed to disprove his assertion of self-defense in light of the fact that the victim, Mr. McGinnis, initiated an assault on Appellant. Appellant contends that evidence established McGinnis was a violent individual and had been threatening and menacing to Appellant on the night of the incident.[1]

_____

[1] To the extent Appellant attempts to present a typical challenge to the sufficiency of the evidence, *i.e.* that the Commonwealth failed to prove particular elements of the crimes, we note that such a claim is waived due to Appellant's failure to specify in his Pa.R.A.P. 1925(b) statement the specific elements of any crime which he deems the evidence presented at trial failed to establish beyond a reasonable doubt. **See Commonwealth v. Williams**, 959 A.2d 1252, 1257-1258 (Pa. Super. 2008) (finding waiver of sufficiency of evidence claim where the appellant failed to specify in Pa.R.A.P. 1925(b) statement the elements of particular crime not proven by the Commonwealth). **See also Commonwealth v. Gibbs**, 981 A.2d 274, 281 (Pa. Super. 2009) (finding sufficiency claim waived under **Williams** for
*(Footnote Continued Next Page)*

We analyze arguments challenging the sufficiency of the evidence under the following parameters:

> Our standard when reviewing the sufficiency of the evidence is whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish all elements of the offense beyond a reasonable doubt. We may not weigh the evidence or substitute our judgment for that of the fact-finder. Additionally, the evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. When evaluating the credibility and weight of the evidence, the fact-finder is free to believe all, part or none of the evidence. For purposes of our review under these

_(Footnote Continued)_ ───────────────────

failure to specify which elements of crimes were not proven beyond a reasonable doubt). Indeed, Appellant's Pa.R.A.P. 1925(b) statement presents the following issue:

> The evidence presented at trial by the Commonwealth was insufficient to sustain a conviction for aggravated assault, simple assault and recklessly endangering another person against the Appellant, especially in light of the defense of self[-]defense which was raised on behalf of the Appellant at trial.

Pa.R.A.P. 1925(b) Statement, 11/18/15, at 1. In finding Appellant's issue to be waived, the trial court observed that Appellant's Pa.R.A.P. 1925(b) "statement language does not specify how the evidence failed to establish [the] element or elements of the offenses for which [Appellant] was convicted." Trial Court Opinion, 1/5/16, at 8.

Likewise, Appellant has failed to specify in his appellate brief the elements of the crimes which were allegedly not met. Consequently, we conclude that any sufficiency-of-the-evidence issue alleging that the Commonwealth failed to prove particular elements of various crimes is waived. **_Williams_**.

principles, we must review the entire record and consider all of the evidence introduced.

*Commonwealth v. Trinidad*, 96 A.3d 1031, 1038 (Pa. Super. 2014) (quoting *Commonwealth v. Emler*, 903 A.2d 1273, 1276-1277 (Pa. Super. 2006)).

We are mindful that "[t]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion."  18 Pa.C.S. § 505(a).  "Although the defendant has no burden to prove self-defense, … before the defense is properly in issue, 'there must be some evidence, from whatever source, to justify such a finding.'"  *Commonwealth v. Mouzon*, 53 A.3d 738, 740 (Pa. 2012) (citation omitted).  Once a justification defense is properly raised, "the Commonwealth bears the burden to disprove such a defense beyond a reasonable doubt." *Commonwealth v. Torres*, 766 A.2d 342, 345 (Pa. 2001) (citations omitted).

The Commonwealth sustains its burden if "it establishes at least one of the following: 1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2) the accused provoked or continued the use of force; or 3) the accused had a duty to retreat and the retreat was possible with complete safety." *Commonwealth v. McClendon*, 874 A.2d 1223, 1230 (Pa. Super. 2005) (citation omitted).  "It remains the province of the [finder of fact] to determine whether the

accused's belief was reasonable, whether he was free of provocation, and whether he had no duty to retreat." *Id*. (citation omitted).

> The Commonwealth can negate a self-defense claim if it proves the defendant did not reasonably believe he was in imminent danger of death or great bodily injury and it was necessary to use deadly force to save himself from that danger.
>
>> The requirement of reasonable belief encompasses two aspects, one subjective and one objective. First, the defendant must have acted out of an honest, bona fide belief that he was in imminent danger, which involves consideration of the defendant's subjective state of mind. Second, the defendant's belief that he needed to defend himself with deadly force, if it existed, must be reasonable in light of the facts as they appeared to the defendant, a consideration that involves an objective analysis.

*Commonwealth v. Smith*, 97 A.3d 782, 787 (Pa. Super. 2014) (citations omitted).

We also note that our legislature has imposed the following limitations on the use of self-defense:

> **Limitations on justifying necessity for use of force.--**
>
> * * *
>
> (2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:
>
>> (i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or
>>
>> (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat

- 10 -

> from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S. § 505(b)(2)(i)-(ii).

> Furthermore:
>
> As the **Mouzon** Court observed, the use of deadly force itself "cannot be viewed in isolation with [the victim] as the sole physical aggressor and [the defendant] acting in responsive self-defense. [T]his would be an incomplete and inaccurate view of the circumstances for self-defense purposes." **Id**. at 549, 53 A.3d at 751. To claim self-defense, the defendant must be free from fault in provoking **or escalating** the altercation that led to the offense, before the defendant can be excused from using deadly force. **Id**. (emphasis added).

**Smith**, 97 A.3d at 787-788. Indeed, we have long explained that the use of deadly force in self-defense is limited to those situations in which the actor was free from fault in provoking or continuing the difficulty which ultimately results in injury. **See Comonwealth v. Alvin**, 516 A.2d 376 (Pa. Super. 1986) (*en banc*) (discussing applicability of legislative language on self-defense charge to the jury).

Our review of the record reflects that the Commonwealth presented testimony from Dr. Stephen Lee Miller, an expert in the field of general surgery and trauma services. N.T., 9/7/11, at 151-157. Dr. Miller was present when the victim arrived at the hospital, and he offered detailed testimony regarding the victim's stab wounds. Dr. Miller explained that the victim suffered a total of seven stab wounds. **Id**. at 153, 156. In addition, the doctor explained that the victim suffered several broken ribs that would

- 11 -

have required significant force, similar to "baseball-bat type force." ***Id***. at 155. Dr. Miller characterized the victim's injuries as "life threatening." ***Id***. at 155-156.

The Commonwealth also produced the testimony of Mr. David Herring, an eyewitness to the incident. N.T., 9/7/11, at 123-144. Mr. Herring indicated that Appellant and Mr. McGinnis were engaged in an ongoing fight on the evening of the incident. ***Id***. at 126. Mr. Herring stated that when they were outside of the bar Appellant and the victim decided to engage in a fight. ***Id***. Mr. Herring further testified that it appeared that the victim rushed at Appellant. ***Id***.

In addition, the Commonwealth presented testimony from Mr. McGinnis, the victim of the stabbing. N.T., 9/7/11, at 48-88. Mr. McGinnis testified that, on the night in question, he and Appellant had an argument at a bar concerning Ms. Snyder. Eventually, Mr. McGinnis and Appellant left the bar and went outside. The following is Mr. McGinnis's account of what transpired in response to the questioning of the assistant district attorney:

Q And after that conversation occurred, what happened?

A [Ms. Snyder], I seen [Ms. Snyder] going outside so I followed her out. She said she was leaving because she didn't want to deal with anything. [Appellant] had came [sic] out after me, and we was outside arguing. Then [Ms. Snyder] and everybody else goes back into the bar.

Q Now, at this time [Appellant] and you were arguing?

A When we got outside, yes, sir, we was arguing.

Q  And the other people that were outside the bar went back in?

A  They all went back in.

Q  Including --

A  [Ms. Snyder].

Q  Was anyone left outside with you and [Appellant] at that point?

A  Yes, [Mr. Herring].

Q  Who?

A  Dave Herring.

Q  So now the three of you are outside.  What transpired?

A  We came to the conclusion that we was going to walk around the building and fight.

Q  Okay.  So it had gotten to that point?

A  Yes, sir.

Q  What did you do – who went around first?

A  [Appellant] started walking first.  I was following him.

Q  What happened?

A  He pulled out the knife and turned around and started stabbing me.

Q  **At that time did you have any weapon on you?**

A  **No.**

Q  **Were you armed at all?**

A  **No.**

Q  Do you recall how many times you were stabbed?

A  Seven.

Q  Do you recall that from that night or from the number of wounds that you have?

A  Well, I know that because of my scars.

Q  After he stabbed you, what did he do?

A  I didn't see him after that.  Apparently he ran.  I was getting up off the ground and he was gone.

Q  And what did you do?

A  I went back in the bar to get help.

N.T., 9/7/11, at 53-55 (emphasis added).

In addition, on cross-examination Mr. McGinnis offered the following testimony:

Q  So you get into an argument and you're not sure who started it?

A  Right.

Q  What happened next?

A  [Appellant and I] came to the conclusion that we was going to go around the bar and fight.

Q  What do you mean -- how do you come to the conclusion? What happened?

A  He said, well, I'll whoop your ass.  I said, I'll whoop your ass, let's go around the building.  And we started walking around the building.

Q  So you're following him?

A  I'm following him, yes.

Q  Do you make it past the corner or are you on that street there?

A  We got pretty much right to the corner, just a little off the sidewalk.  We didn't make it around the building.

Q  What happens then?

A  He pulled out his knife, turns around and started stabbing me.

Q  He turns around - -

A  With the knife.  The knife was already out.  When he turned around he was cutting me.

Q  And did you recall or do you recall, was anyone else outside?

A  Dave Herring.

Q  And Mr. Herring, how close was he to you and [Appellant]?

A  A few feet behind us.

Q  From the time you saw the knife until the fight was over let's say, how much time lapses?

A  I'm not sure how long.  It was that fast (indicating).  He turned around and it happened that fast.

Q  Now, when you saw this knife what did you do?

A  I put my arms up and tried to back up.  I didn't really see the knife until it was too late.  He was already swinging it.  I just seen the blade.

Q  When he turns around and you see the knife, how far apart were the two of you?

A  Maybe a foot or two.  It was right there.

Q  And did the two of you end up in an embrace?

A  I'm not sure.  I started getting cut and tried to get away.  That's probably why I was stabbed four times in my back.

Q  Now, I asked you previously about 2005 -- let's go back to the fight for a second.  Was it possible that you lunged initially at [Appellant]?

A  No.  I didn't make a move until I was cut.  I'm not the type to put my hands on somebody first.

*Id*. at 83-85.

Considering the evidence in the light most favorable to the Commonwealth, we conclude that the Commonwealth met its burden of disproving Appellant's claim of self-defense.  After presentation of conflicting evidence, the jury was entitled to reject Appellant's claim that he, either subjectively or objectively, reasonably believed that his life was in imminent danger, and, even if he did, Appellant did not attempt to retreat before using deadly force.  Rather, Appellant unreasonably and unjustifiably escalated the confrontation when he pulled out a knife and stabbed the unarmed victim seven times.  Based on the foregoing, we conclude that the Commonwealth sustained its burden of disproving Appellant's justification defense beyond a reasonable doubt.  Hence, Appellant's contrary claim lacks merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/6/2016